UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
PEOPLE OF THE STATE OF NEW YORK, by     :      05 CIV. 9132(DLC)
ELIOT SPITZER, Attorney General of the  :
State of New York,                      :
                                        :      OPINION & ORDER
                 Plaintiffs,            :
                                        :
         -v-                            :
                                        :
JOHN CAIN and LUIS MENCHACA,            :
                                        :
                 Defendants.            :
                                        :
----------------------------------------X

Appearances:

For the Plaintiffs:
Lisa Landau, Esq.
Director, Reproductive Rights Unit
Anne Pearson, Esq.
Assistant Attorney General
Office of the Attorney General
120 Broadway
New York, NY 10271

For the Defendants:
Christopher A. Ferrara, Esq.
American Catholic Lawyers Association, Inc.
30 West Broad Street, Suite 405
Rochester, NY 14614

DENISE COTE, District Judge:

     Plaintiffs, the People of New York, represented by their

Attorney General, move for preliminary injunctive relief in a

civil suit under the federal Freedom of Access to Clinic

Entrances Act ("FACE"), 18 U.S.C. § 248, the New York state

analog, and the common law of nuisance.  Plaintiffs claim that

defendants' conduct outside the Margaret Sanger Center, a

reproductive health facility in Manhattan, violates federal and

state law.  For the reasons more fully described below, the

motion is granted in part.

The following constitutes this Court's findings of fact, based on an evaluation of all of the evidence, including witnesses' credibility, and conclusions of law. Where the defendants have given testimony that directly contradicts the facts as found by the Court, their testimony will often be described with the relevant event.

I.

A. The Center

The Margaret Sanger Center ("Center") is located on the corner of Mott and Bleecker Streets in Manhattan. Although the Center's address is 26 Bleecker Street, the entrance door actually opens on the sidewalk on the east side of Mott Street, approximately thirty feet south of the intersection.

The Bleecker Street subway exit is approximately 200 feet from the entrance to the Center. The route to the Center from the subway takes one east on Bleecker Street on a sidewalk approximately fourteen feet wide, from the west corner of Mott Street to the east corner, and then right on Mott Street. The sidewalk on Mott Street outside the entrance of the Center is thirteen feet wide.

The parties agree that the area surrounding and leading up to the entrance to the Center is filled with verbal abuse, confrontation, physical threats, and at times, physical assaults. The parties differ on who is responsible for the aggressive behavior, but they describe a scene filled with tension, brimming

with anger, and infused with the expectation of imminent danger. The frequency and intensity of confrontations has increased over time, becoming particularly volatile in 2005.

B.  The Defendants

Defendant John Cain ("Cain") is sixty-nine years old.  He is six feet tall and estimates his weight to be 204 pounds.  He taught full time in grade schools in this City's public school system until December 2002.  Since then he has been teaching on a substitute basis.  He began demonstrating against abortion in 1970.  Cain vowed to devote himself to the pro-life cause out of his religious convictions as a Roman Catholic.  Cain explains that he is "particularly motivated" to demonstrate at the Center because he is married to a black woman.  He believes that 80% of the women who come to the Center for abortions are black and that abortion is a crime of genocide against black people.

Defendant Luis Menchaca ("Menchaca") is sixty-three years old.  He is five feet, seven inches tall and estimates his weight to be between 180 and 190 pounds.  He has gray hair and a gray beard, both ungroomed and fairly long.  He served in the United States Navy from 1962 to 1966.  From 1966 to 1985, he worked as a deck seaman, in boat yards, and as a messenger.  He is a Roman Catholic, and has been active in the pro-life movement since 1986.  Reflecting these two facets of his life, Menchaca has taken on the nickname "Lifeboat," and is frequently referred to in this way by both Cain and the escorts who volunteer at the Center.

This is not the first time that Menchaca has been accused of

3

violating the law in the course of his protest activities.  In
2002, Menchaca was convicted in a New York state court of
obstructing access to a reproductive health care facility in
Buffalo after he entered the facility and lay down on the floor.
He testified that he spent some time in jail as a result of the
conviction, but did not specify how long.  He is also the subject
of two permanent injunctions issued by federal courts for past
violations of FACE involving other clinics.  The first resulted
from Menchaca's participation in a series of blockades at a
clinic in Englewood, New Jersey, during which Menchaca helped to
block the entrance of a clinic by either lying down or locking
himself with a bicycle lock to other protestors.  See United
States v. Gregg, 32 F. Supp. 2d 151, 153-54 (D.N.J. 1998), aff'd,
226 F.3d 253 (3d Cir. 2000).  The second results from his
obstruction of access to a medical facility in Dobbs Ferry, New
York.  See United States v. Menchaca, No. 96 Civ. 5305 (S.D.N.Y.
Sept. 3, 1996).  Menchaca recalled spending time in jail
following his activities in Dobbs Ferry, but could not recall the
judicial process that led to his incarceration.  Evidence of
these other violations of the law is admissible as evidence of
Menchaca's intent and motive, and the absence of mistake or
accident.  Fed. R. Evid. 404(b).  The strong probative value of
the evidence is not substantially outweighed by any of the
concerns identified in Rule 403, Fed. R. Evid.

While the two defendants undoubtedly share a passion for
their anti-abortion cause, they are very different as
individuals, and their differences were reflected in their
demeanor as witnesses at the hearing.  Menchaca is less educated,

4

less sophisticated, and more volatile than Cain.  He has trouble concentrating and absorbing information, as evidenced by his difficulty recalling and swearing to the truthfulness of Cain's affidavit, large sections of which he had explicitly incorporated into his own.[1]  But when his attention is focused and he understands a question placed to him, his answers are likely to be honest.  During his testimony, he conveyed his sincere desire to avoid another period of incarceration.

Cain, in contrast, is a much more deliberate and calculating individual.  He was combative during questioning, and seemed as intent on making a point and advancing his cause as answering the questions truthfully.  He was, as a result, much less credible as a witness.

C. General Activities at the Center

Protestors first began to appear at the Center in 2001.  The two defendants began protesting there together in late 2003. Since that time, on Saturdays, and beginning in the late summer of 2004, on Thursdays, the defendants have been protesting regularly outside the Center.  They arrive at approximately 7:00 a.m.  While the defendants used to leave the Center by 11:00 a.m., they now stay until after noon.

The defendants work with another anti-abortion advocate, Paul Morrissey ("Morrissey").  Usually, Morrissey approaches women as they emerge from the subway station on Bleecker Street.

---

[1] It became apparent during the hearing that Menchaca's affidavit constituting his direct testimony was not truly his own, and that his adoption of it, while perhaps sincere, is unreliable.

The defendants then take over from Morrissey as the women come closer to the Center. Occasionally, however, defendants walk down Bleecker to meet women exiting the subway and follow them back to the Center.

The defendants routinely post large posters by leaning the posters on lampposts, cars parked on Bleecker Street, or occasionally on the outside wall of the Center itself. They frequently place one of these signs, which they refer to as the "Baby Malachi" sign, somewhere around the southeast corner of Bleecker and Mott Streets.[2] Cain contends that "numerous" women who have seen the sign become upset and turn around. Overall, he estimates that 10 to 25% of pregnant women with whom the defendants interact outside the Center decide not to go through with an abortion. On one occasion Cain describes, soon after he began protesting at the Center, a woman emerged from the Center, hugged him, and said she had changed her mind because of his message. There was no independent evidence offered to substantiate any of these claims.

Most women, it seems, are less thankful for the defendants' intervention in their lives. Because of the defendants' actions, patients often enter the Center teary and upset. Others are confused, disoriented, intimidated, or angry. This is in

---

[2] Cain alleges that the poster depicts an aborted fetus at 26 weeks. Depictions of "Baby Malachi" are a frequent tool of pro-life advocates. See, e.g., World Wide Street Preachers' Fellowship v. City of Owensboro, 342 F. Supp. 2d 634, 636 (W.D.Ky. 2004). See generally Flip Benham, Operation Save America, Baby Malachi: A History of a Little Boy, http://www.operationsaveamerica.org/brochures/acrobat/Malachi-1.pdf (describing history of "Baby Malachi").

contrast to patients' demeanor on the days when the defendants are absent. A social worker at the Center observes that patients are more nervous and emotional on the days when the defendants are present than other days.

Approximately 25% of patients arrive by car. Most cars drive down Bleecker and let patients out on the southeast corner of Bleecker and Mott. Occasionally, the cars drop off patients on Mott, just outside the Center's entrance.

The majority of the Center's patients arrive by subway. Morrissey or one of the defendants meets women at the Bleecker Street subway station, and tries to give them pamphlets. After the patient crosses Mott Street, the defendants frequently flank the patient, or if she is walking quickly, follow closely behind her, accompanying her to the Center's door. They are often just inches away from her, so that if the patient stops moving before reaching the Center, the defendants run into her from behind. As they walk alongside or behind the patient, one of the defendants will talk to her, pleading with her not to have an abortion.

Once a woman whom the defendants have approached indicates that she is not interested in the defendants' message, they increase the volume of their voices and adopt a more intimidating tone. They move closer physically to the woman and become more aggressive in their interactions. Several witnesses demonstrated in court the relative positions of the defendants to patients when they approach closely to hand out literature. A defendant stands a few inches to the side and just in front of a patient, with his body angled towards hers somewhere between forty-five and ninety degrees. With their shoulders almost touching, he

extends his arm out directly in front of her with the literature
he wishes her to take.  The defendant maintains this position
until the patient reaches the clinic door.

Sometimes the defendants move to place themselves directly
in front of patients as they walk towards the Center, forcing the
women to choose between pushing through the men or backing up and
trying to walk around them.  Frequently, women who notice the
defendants standing at the corner of Mott and Bleecker Streets
attempt to escape the defendants by walking into the street and
weaving between the parked cars on Mott Street instead of
crossing in the crosswalk.  One escort estimated that it takes
approximately twice as long for women who have been approached by
one of the defendants to reach the Center as it does for women
who are not approached.  Because the entrance of the Center is so
close to the intersection, however, it takes only a matter of
seconds for a patient to enter the Center if her path is
unobstructed.

While the defendants used to stay some feet away from the
entrance to the Center, more recently they follow patients right
up to the doorway.  On occasion, Menchaca stands directly in
front of the Center's door, facing the door to prevent it from
being opened.  When asked to move, he ignores the request, and
only moves after the security guard, who works inside the Center,
leaves his post to address the situation or after the police are
called.

Cain denies that either defendant blocks the door.  He
asserted that they generally stay fifteen feet away from door as
women approach it, five feet away as they enter, and then two to

three feet from the door after a woman enters.  More credible evidence from the plaintiffs' witnesses and even videotapes offered by the defendants as exemplars of their habitual protest activity demonstrate to the contrary.  In one videotape, Menchaca is seen following women to the door, at one point getting sufficiently close to the threshold of the Center that he can be seen through the clear glass of the open door from the security camera mounted on the external wall of the Center.  In another videotape clip, Menchaca is at the edge of the open door, and Cain is visible immediately behind him, and leaning over him in order to project his voice into the Center.

As the door to the Center is opened, Cain often screams "Stop the murder in there," or "Murderers; they're killing babies," or "There's murder in there."  Although the defendants have denied that Cain is shouting so loudly that his voice can be heard on the second floor of the Center and as high as the fourth floor in buildings across the street, Cain admits that he tries to elevate his voice whenever the door to the Center opens so that he will be heard inside the waiting room, and the credible evidence establishes that he is indeed shouting as loudly as he can with his deep, resonating voice.

The defendants routinely make overtly hostile comments to the escorts who guide patients to the Center door in a tone clearly intended to intimidate.  Credible testimony from escorts reports the defendants making abortion-specific statements to the escorts such as "I'd like to stick a coat hanger in you" or "I hope what happens to those babies happens to you," as well as more general comments such as "Burn in hell" and "You'll be lucky

if you're alive next week." Defendants also make derogatory comments regarding an escort's gender, sexual orientation, and perceived physical characteristics.

D. Findings Relating to Specific Occasions

The findings of fact in this Opinion stem largely from detailed descriptions of specific incidents by the witnesses who testified during the hearing. This evidence established that Menchaca, frequently motivated by a desire to protect the protestors' signs, has engaged in physical confrontations with escorts and assaulted them. Cain has had less physical contact with escorts, but he has repeatedly uttered threats that frightened escorts, leading some of them to give up working at the clinic because of concern over their safety. Both defendants have physically obstructed access to the Center. As time has progressed, both men have become bolder and more confrontational in conveying their message and in attempting to intimidate both patients and escorts. The following describes some of the more noteworthy incidents about which the witnesses testified at the hearing.

The earliest specific occasion about which there was testimony occurred around August 2003. A patient walking toward the Center was confronted by Cain and another man (possibly Morrissey) who regularly participates in protest activities at the Center. The two men cornered the petite woman against a wall as she approached the Center and began to yell at her. An escort helped to extricate the woman, who ran away from the Center in tears.

On January 22, 2004, Cain became upset when an escort got in his way while walking a patient to the Center door. After she let the patient in, he screamed at her "I will knock your teeth out if you get in our way again." The escort called the police to complain about the threat, and two officers came to speak with the defendants.

Cain denies that he ever said this. His denial is not credible. In his direct testimony, he explained that what he has said to escorts is that he would call the police if they got in his way again. During examination by the Court on this incident, he denied making any comment at all similar to what the escort described, but did claim to have called the police at some point in 2004 in response to being "boxed out" by an escort.

There was testimony about a few additional instances of confrontational conduct in early 2004. For instance, on February 28, Cain used his body to partially block the Center entrance, making it difficult for patients to enter and leave. An escort on duty that day noted that several patients, their friends and family members responded to the behavior of Cain and another protestor by making verbal threats.

In March 2004, one of the escorts drove her parents' car to the Center and parked her car directly outside it. After she left the car, Cain made a point of being seen inspecting the license plate of the escort's car. The escort became fearful that Cain might post the license plate on the internet and that her parents would be targeted by violent pro-life advocates.

Toward the end of 2004, the pace and intensity of the confrontations increased. In October or November 2004, Cain

11

threatened an escort that he would "knock [her] in the head."
Moving within inches of her, he said, "be careful, we're watching
you; get in my way, you'll live to regret it." Cain told another
escort during this time period, "I'd like to do to you what they
do to babies", and "I'd like to stick a coat hanger in you."

On November 6, a yelling match erupted when a patient asked
Cain to leave her alone. After the police had responded to the
scene and left, Cain deliberately pushed into an escort as she
was opening the door for a patient. Then he stepped back and
walked away.

On December 4, Cain and Menchaca made comments to an escort
about her coffee, to the effect, "How's that coffee. In a few
hours you won't be feeling too well," and "I hope you have
someone to take you to the hospital." The escort had left her
coffee cup outside for a few minutes while she went into the
Center, and worried that the defendants had actually put
something into her drink. Cain contends that the escort simply
misunderstood a story about coffee that he and Menchaca were
discussing.

Cain and Menchaca were at the Center conducting their
protests on December 18. Cain said to the escorts, "someone will
set off a bomb here someday." One of the escorts related this
event in an email to Center staff shortly thereafter, explaining
that Cain had uttered the comment about the bomb "under his
breath" but in a manner that appeared intended to be heard by the
escorts.[3] That day, Cain also told the escort, "You'll be lucky

_____

[3] When asked about the Center's reaction to Cain's statement
about a bomb, the escort testified that the incident was brought

if you're alive next week," a remark he has made more than once to escorts. When the escort and Cain bumped into each other, Cain said, "That'll be the last thing you do if you don't watch out."

In January 2005, an escort noticed one of the defendants' signs leaning up against the portion of the Center wall close to the corner of Mott and Bleecker Streets. Believing this placement to be illegal, the escort asked the defendants to move the sign. When the defendants refused, the escort approached the sign and picked it up, intending to move it herself to the lamppost on the corner. Seeing this, Menchaca rushed at the woman from behind, reached around her left side, and grabbed the sign out of her hands. Although Menchaca did not intend to come into contact with the escort, he came with such speed that he did not come to a full stop by the time he reached her, and the front of his body made contact with the back of hers as he lunged for his sign.

Menchaca acknowledges that this incident occurred, but denies that he made physical contact. According to Menchaca, he saw the escort reaching for his sign and went over to retrieve his property from her. He testified that he did not reach around the escort.

On March 12, an escort placed herself between the defendants and the patients so that the patients could reach the Center's entrance. Cain got close to her, pointed his finger in her face and screamed "stay out of my way. This is your last warning."

up at the next quarterly escort meeting in the context of a discussion of the escalating conduct of protestors outside.

When a police car arrived and stayed for forty-five minutes to an hour, apparently responding to a neighbor's complaint about the noise the defendants were making, the defendants were quiet and did not come near the clinic entrance.  After the police left, the defendants yelled at the escort, "may what happens in there happen to you," and "may you burn in hell."  This was the kind of statement that several escorts reported that Cain said to them at different points in 2005.

Cain counters that what he said was "This is your last warning, you've been bumping into me, before I call the police.  Please stop."  He further testified that he in fact called the police that day.  Neither assertion is credible.  When asked at another point in his examination if he had ever called the police in response to something an escort had done, Cain said that he did, but identified the date as "some time in '04," and explained that it involved another escort.

That same day, an escort saw the defendants stand near car doors so patients could not leave their cars.  One patient called the police from her cell phone outside the clinic to complain about how the defendants had blocked her progress to the Center.  The police came for a second time that day and spoke to the patient and the defendants.  After the police left, the defendants resumed blocking women who tried to exit their cars.

When another patient left the Center and tried to enter a waiting car, the defendants surrounded her to prevent her from doing so.  The man driving the car got out of the car to extricate her and help her enter the car.

One week later, on March 19, Menchaca spoke to two men who

were on the sidewalk across the street from the Center. Cain
identifies the men as Mexican and states that he and Menchaca
told the men about what goes on in the Center and why the
defendants were protesting against it. Immediately afterwards,
and for 2-3 minutes, the two strangers threw gravel and small
rocks across the street at the escorts and the Center. Cain
said, "you're lucky they're not hitting you in the head. You
better watch out for next time." As Cain walked by an escort, he
muttered that he was going to "bash your fucking head in."
Although she did not hear any other words surrounding this
phrase, the escort understood what she heard as a threatened
assault by Cain.

On April 7, Menchaca blocked the door of the Center several
times. When Center personnel asked him to stand back, he
refused. He also approached one of the Center escorts and got as
close as he possibly could to her without actually touching her.
From that position, he told her to go ahead and call the police.

Just two days later, on April 9, Menchaca came up to an
escort and, pressing his body into him, screamed at him "how can
you do what you do?" and "we're not going to take this anymore."
When the escort told Menchaca, "you need to move away," Menchaca
screamed, "you need to move away," and pushed the escort. The
escort became frightened of what Menchaca might do next, and he
called the police from his cell phone. In the meantime, another
protestor approached Menchaca and dragged him away. Both men
were gone by the time the police arrived. The police were called
to the Center again, on May 1, when Cain and one other protestor
blocked a woman, impeding her progress toward the building.

Only one patient who receives medical care at the Center testified at the hearing. Her testimony was particularly graphic about Cain's efforts to prevent her from entering the Center. On June 11, Cain approached the patient in the crosswalk, walking with her until she turned toward the Center. He tried to hand her anti-abortion pamphlets. When she rejected the materials, he yelled at her in a loud voice, "think about the baby. You'll be killing the baby," and "abortion is murder, you have other options. We can help you find other options." Cain then stepped directly in front of her, dodging back and forth to prevent her from approaching the Center. While he did this, he was shouting at her, just inches from her face. She was extremely frightened by the aggressive, threatening behavior of this stranger, a man so large and close to her that he filled her field of vision. She stepped backwards, putting her hands in front of her to create some distance. Cain continued to yell at her. When she told him that she was not pregnant, he moved out of her way and said, "Oh, okay then. You can go in."

Several escorts have stopped working at the Center after incidents with the defendants made them too frightened for their own safety to continue their volunteer work. One such incident occurred on July 9, 2005. When the escort arrived at the Center at about 7:40 a.m., the defendants and another protestor were already there, walking close to patients as they approached and entered the Center, yelling at them along the way, and yelling into the Center when the door opened.

At 8:45 a.m., the escort was standing on Bleecker Street near its corner with Mott, about two to three feet in front of a

16

light post against which a three-by-four foot anti-abortion sign was leaning. Menchaca tried to move the sign up higher on the post so that it would be more visible. A passerby approached Menchaca and told Menchaca not to bother the patients. During their exchange, Menchaca, who was standing to the left of the escort, hit her with a second poster that he was carrying under his arm. It was made of stiff, corrugated material. The escort responded, "hey, you hit me with your sign, don't hit me." The man also told Menchaca not to hit the escort with the sign. Menchaca's response was to back into the escort repeatedly with the sign, jabbing it into her. When she again asked Menchaca to stop hitting her, he shouted that she had to move, not him. He then purposely brushed up against her as he went to a parked car.

Another escort saw what was happening and called the police. The police arrested Menchaca. He has been charged in state court with harassment and disorderly conduct, and an order of protection has been entered against him to forbid him from harassing, assaulting, or engaging in any other illegal conduct toward the escort.[4] The escort is too afraid to return to act as an escort and has not done so.

Cain asserts, improbably, that Menchaca was holding a poster and that the escort repeatedly leaned into it and proceeded to pretend that Menchaca was hitting her with it. Cain accused the escort of engaging in "play-acting" and melodrama, crying out

_____

[4] At the hearing, Menchaca testified that he recalled being arrested and appearing in court, but he did not seem to be aware that an order of protection had been entered against him. The Court drew his attention to its essential terms and asked defense counsel to review it with him.

"ouch" and "stop hitting me".  In his examination by the Court about the incident, Menchaca was unclear on the events leading up to the encounter.  He could not remember if it was he or the escort who was at the corner first, but he admitted that he might have seen her standing by the sign and approached her in order to protect his sign.  He stated that he often gets close to escorts when he sees them near his signs.  Menchaca denies hitting the escort, but admitted that he did not move at all when she told him to stop hitting her because he did not want to leave his property unattended.  He agrees that a passerby intervened.

The last significant incidence of violence occurred on October 1, when Menchaca and a neighborhood resident were arguing over an anti-abortion sign.  The man, who was carrying a child on his hip, refused to accept literature from the defendants.  The man grabbed a sign from Morrissey, walked away and threw the sign to the ground.  Menchaca then grabbed the man from behind and would not let him go until a passerby intervened to pull Menchaca off the man.  Menchaca shoved the resident, even though the resident was carrying a small child.

Cain provides a different description of this incident.  He asserts that the man with a child was accompanying a woman into the Center, and that he shouted at the protestors to leave them alone and that nobody was going into the Center to get an abortion.  After shouting this, he grabbed Morrissey's sign, and then hit Menchaca on the arm.  Cain does not deny that Menchaca grabbed the man or that a passerby intervened and told Menchaca to be careful because the man was carrying a baby, but he does deny that someone had to pull Menchaca off the man.  Menchaca

denies any physical contact with the man, aside from getting hit in the arm. In his direct testimony, Menchaca acknowledged that a passerby intervened to draw attention to the presence of a child, but during examination by the Court, he denied any intervention by a third party. He claimed instead that the incident ended as soon as the man relinquished the sign.

Finally, on another day in October 2005, the defendants told an escort "you better not go home alone," and "we've got our eyes on you." The escort interpreted these statements as an attempt to make her feel as if she would be followed home, and was consequently very nervous.

E. Noise Inside the Center

The defendants' yelling is audible on the second floor of the Center, where patients are counseled both pre-operatively and post-operatively. Some of the pre-operative counseling rooms have windows that overlook the corner where the protestors most often interact with patients and escorts. The noise is so loud on occasion that questions and answers have to be repeated. According to counselors at the Center, this has a serious impact on the patients. Patients are distracted by the noise and are unable to focus on questions and instructions given to them. Their concentration is impaired as they provide important medical information to the counselors, including medical histories and consent to treatment. Because of the need to repeat questions and answers and the patients' impaired concentration, counseling sessions take longer when defendants are outside than on other days.

A nurse who instructs patients in recovery rooms on the
second floor about post-operative care, including instructions
about medication, reports that the yelling interferes with her
work.  She is worried that patients are not absorbing everything
she says because the screaming distracts them.  Some patients
have refused to leave the Center until the protestors have left.

F. Noise Impact on Block Residents

The noise from the defendants' yelling is loud enough to
wake up and disturb residents of the neighborhood around the
Center.  Residents of a fourth floor apartment across Bleecker
Street from the Center with a bedroom that faces the Center have
been awakened at 7:30 a.m. on Saturdays by the screaming.  The
couple almost always calls 311 to complain about the noise, but
the screaming resumes within ten to fifteen minutes of the police
leaving the scene.

Another neighborhood resident and her 6 year-old son live in
a third-floor loft apartment close to the Center.  The mother
describes the defendants' shouting as bellowing that is "akin to
a slow torture."  It wakes her and her son up.  She has called
the local precinct to complain about the noise between seven to
ten times.  She also reports that the defendants stop shouting
when the police arrive and resume their shouting after the police
leave.

G. Violence against Defendants

The defendants describe various incidents in which they have
been verbally abused and physically attacked by angry

neighborhood residents. With one exception, they do not identify any of the attackers are employees of the Center. Cain asserts that in the fall of 2005 a Hispanic female custodian at the Center told him that she wanted to kick his ass.

## H. Procedural History

The procedural framework for the hearing was established at a conference on November 11, 2005, and subsequently fleshed out by this Court's Order of November 14. All direct testimony was taken by affidavit, and each side was allowed a total of five hours for cross- and redirect examination of all witnesses. Defense counsel initially objected to an equal distribution of time, given the disparity between the numbers of witnesses each side proposed to call (11-12 for the plaintiffs, 6 for the defendants), while agreeing to the overall time limit; by the end of the conference, however, defense counsel appeared to withdraw his objection, indicating an expectation that the time allotted to him would be sufficient. Each party was also given an additional 30 minutes for summation arguments.

The hearing began on January 10, 2006. Over the course of that day and the following day, testimony was received on cross- and redirect examination from both defendants; a counselor, a nurse, a social worker, and six escorts who work at the Center; a patient of the Center; and a resident of the neighborhood where the Center is located. The hearing adjourned on January 11, and resumed on January 31 so that two more witnesses, an escort and another area resident, could be examined. At the close of the evidentiary portion of the hearing, the parties were asked to be

prepared to present argument on the language requested by the plaintiffs in their Proposed Preliminary Injunction. These arguments were heard after summation arguments on February 3.[5]

## II

A. Standing

FACE provides that whoever

by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or class of persons from, obtaining or providing reproductive health services . . . . shall be subject to the penalties provided [in the Act].

18 U.S.C. § 248(a)(1). In addition to criminal penalties, FACE also creates civil rights of action for "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a)," id. § 248(c)(1)(A), and for an attorney general (state or federal) who "has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation" of the Act. Id. § 248(c)(2)(A) & (c)(3)(A).

Defendants argue that the Attorney General of New York, lacks standing to request injunctive relief in this case because the Attorney General does not represent anyone who claims to be

---

[5] Defense counsel came to summation unprepared to discuss any specific terms of the proposed injunction, notwithstanding the Court's advance request. The following week, counsel submitted "Defendants' Further Objections to Proposed Preliminary Injunction" to the Court in writing.

aggrieved by their activities outside the Center.[6]  The Attorney

General is, on the defendants' view, a lawyer without a client.

The defendants misconstrue both the Act and the power of a

state to bring suit on behalf of its citizens in federal court.

FACE does not, as defendants imply, authorize a state attorney

general to bring an action on behalf of an aggrieved person.  Nor

could it.

"The state cannot merely litigate as a volunteer the

personal claims of its competent citizens."  New York ex rel.

Abrams v. Seneci, 817 F.2d 1015, 1017 (2d Cir. 1987) (citing

Pennsylvania v. New Jersey, 426 U.S. 660, 665 (1976)).  For in

---

[6] Defendants in fact devote the bulk of their argument to
their claim that the Attorney General lacks standing to recover
damages for the New York treasury.  Because the plaintiffs'
motion seeks only preliminary injunctive relief, any arguments or
decision on the propriety of damages at this point would be
premature.  This Opinion therefore considers only the plaintiffs'
standing to seek injunctive relief.
     Should it be necessary, the parties would have an
opportunity at a future stage in these proceedings to argue the
propriety of an award for damages, and whether the damages are
intended to remedy harm to the People of New York or to specific
individuals aggrieved by defendants' unlawful conduct.  Compare
18 U.S.C. § 248(c)(2)(B) (authorizing, in a suit brought by the
Attorney General of the United States, "compensatory damages to
persons aggrieved as described in paragraph (1)(B)") with id. §
248(c)(3)(B) (authorizing "compensatory damages" in a suit
brought by a state Attorney General), and New York ex rel. Abrams
v. Seneci, 817 F.2d 1015, 1017 (2d Cir. 1987) (holding that a
state does not have standing to sue in a representative capacity
to recover damages for injuries suffered by individuals).
     Parties will further be able to argue whether statutory
damages are available in suits brought by a state Attorney
General.  Such damages are authorized explicitly in suits by
"person[s] aggrieved," and by reference in suits by the United
States Attorney General.  Paragraph (c)(3)(B), under which
plaintiffs proceed, is more ambiguous.  Compare 18 U.S.C. §
248(c)(1)(B) ("plaintiff may elect . . . to recover . . .
statutory damages") and id. § 248(c)(2)(B) ("the court may award
. . . compensatory damages to persons aggrieved as described in
paragraph (1)(B)") with id. § 248(c)(3)(B) ("the court may award
. . . compensatory damages, and civil penalties as described in
paragraph (2)(B)").

such a situation, the state is merely a nominal party and lacks a "concrete private interest in the outcome of the suit" sufficient to confer standing. <u>Connecticut v. Physicians Health Servs. of Conn.</u>, 287 F.3d 110, 118 (2d Cir. 2002) (citation omitted). Defendants' protestations that the Attorney General does not represent an identifiable individual are entirely misguided; a state can no more bring suit on behalf of a particular citizen as a personal attorney than it can as an assignee. <u>See id.</u>; <u>but see Alfred Snapp & Son, Inc. v. Puerto Rico</u>, 458 U.S. 592, 611 & 612 n.2 (1982) (Brennan, J., concurring) (arguing that "the prerogative of a State to bring suits in federal court should be commensurate with the ability of private organizations" and noting that private organizations may have representational standing).

A state can, however, bring suit as <u>parens patriae</u> on behalf of citizens generally. This is what FACE in fact authorizes. <u>See</u> 18 U.S.C. 248(c)(3)(A) (providing that an "Attorney General may commence a civil action in the name of [a] State, as <u>parens patriae</u> on behalf of natural persons residing in such State").[7]

In order to have standing to bring suit as <u>parens patriae</u>, "the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign

___

[7] In light of this explicit statement in the Act, it is clear that the People, as represented by the Attorney General, have statutory standing. <u>See</u> <u>Connecticut v. Physicians Health Servs. of Conn., Inc.</u>, 287 F.3d 110, 120 (2d Cir. 2002) ("When determining whether a state has <u>parens patriae</u> standing under a federal statute, we ask if Congress intended to allow for such standing."). Defendants' bald assertion to the contrary is baffling.

interest." <u>Snapp</u>, 458 U.S. at 607. Although this concept does not lend itself to facile definition, <u>see</u> <u>id.</u> at 601, the Court made clear that "a State has a quasi-sovereign interest in the health and well-being -- both physical and economic -- of its residents." <u>Id.</u> at 607. Injury to this interest therefore suffices to create <u>parens patriae</u> standing.

In this case, the Attorney General claims that the defendants' actions have impeded New Yorkers' access to and ability to benefit from reproductive health services. This claim articulates an injury to the state's interest in the health and well-being of its citizens. Indeed, the Court has specifically noted that the state's interest in protecting the health of its citizens "may justify a special focus on unimpeded access to health care facilities and the avoidance of trauma to patients associated with confrontational protests." <u>Hill v. Colorado</u>, 520 U.S. 703, 715 (2000). For the "targeted picketing of a hospital or clinic threatens not only the psychological, but also the physical well-being of the patient held 'captive' by medical circumstance." <u>Madsen v. Women's Health Center</u>, 512 U.S. 753, 768 (1994); <u>see also</u> <u>Operation Rescue Nat'l</u>, 273 F.3d at 202 (government interests in public safety and order and safeguarding private property supported FACE injunction).

It is not fatal to the plaintiffs' <u>parens patriae</u> standing that the alleged violations of FACE might have directly impacted only a relatively small number of people. The Court has warned that focusing solely on the number of directly affected individuals will lead to "too narrow a view of the interests at stake." <u>Snapp</u>, 458 U.S. at 609. A court must therefore

"consider 'indirect effects of the injury' as well as direct ones to determine 'whether the state has alleged injury to a sufficiently substantial segment of its population'" to justify parens patriae standing.  New York ex rel. Abrams v. 11 Cornwell Co., 695 F.2d 34, 39 (2d Cir. 1982) (quoting Snapp, 458 U.S. at 607), vacated in part on other grounds, 718 F.2d 22 (2d Cir. 1983).  It does not matter that the defendants have focused their efforts on a single provider.  The defendants' actions at the Center may deprive any number of persons of the opportunity to receive reproductive health services.  See 11 Cornwell Co., 695 F.2d at 39.

In this regard, it is significant that the State of New York has passed its own legislation, under which the plaintiffs also state a claim in this action, designed to protect access to reproductive health care facilities.  N.Y. Penal Law §§ 240.70-240.71; N.Y. Civ. Rights Law § 79-m.  In Snapp, the Supreme Court explained that a "helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  Snapp, 458 U.S. at 607.  Here the State has attempted to address the problem through its legislative process, offering further assurance that the type of injury is of sufficient magnitude and concern to justify a parens patriae suit.[8]

---

[8] The fact that the State has passed its own law to address this question does not mean that it should be denied recourse to the federal cause of action provided by FACE.  "Just as [a state] may address [a] problem through its own legislation, it may also

Finally, it is worth noting that, although not addressed directly, several decisions by the Court of Appeals for the Second Circuit imply that a state has <u>parens patriae</u> standing to protect the ability of its citizens to access reproductive health services. In <u>United States v. Vazquez</u>, 145 F.3d 74 (2d Cir. 1998), for example, the Court of Appeals noted the propriety of a joint civil action under FACE brought by the United States and the State of Connecticut, as <u>parens patriae</u>. <u>Id.</u> at 84. Indeed, the Second Circuit praised the "voluntary cooperation" between the two co-plaintiffs as "eminently desirable." <u>Id.</u> at 85. It is unlikely that such language would have been used if one of the parties had lacked standing to bring suit under the Act. Furthermore, in <u>New York ex rel Abrams v. Terry</u>, 45 F.3d 17, 22 (2d Cir. 1995), the Court of Appeals affirmed the district court's conclusion that subject matter jurisdiction existed in the State's action to enjoin the defendants from interfering with access to reproductive health care clinics. While the focus of the inquiry into jurisdiction was on the availability of a claim under 42 U.S.C. § 1985(3), rather than on the Attorney General's standing, the decision to allow the district court to proceed to the merits of the case strongly implies that standing existed.

B. The Standard for Issuance of a Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must establish: (1) the likelihood of irreparable harm in the absence

---

seek to assure its residents that they will have the full benefit of federal laws designed to address [the same] problem." <u>Snapp</u>, 458 U.S. at 609-10.

of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in its favor.  <u>Malletier v. Burlington Coat Factory Warehouse Corp.</u>, 426 F.3d 532, 537 (2d Cir. 2005).  Defendants urge the application of the more stringent standard that must be met by a plaintiff seeking a mandatory injunction, i.e., a clear or substantial likelihood of success on the merits. <u>See</u> <u>Bronx Household of Faith v. Board of Educ.</u>, 331 F.3d 342, 349 (2d Cir. 2003).  Because the requested injunction will alter the status quo, they argue, it is more properly characterized as a mandatory injunction than a prohibitory injunction, which would simply preserve the status quo.

"The distinction between mandatory and prohibitory injunctions, however, cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset." <u>Abdul Wali v. Coughlin</u>, 754 F.2d 1015, 1025 (2d Cir. 1985), <u>overruled on other grounds</u>, <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342 (1987).  An injunction that prevents a defendant from continuing to interfere with a plaintiff's rights, while altering the status quo (by commanding a cessation of the interference), is nonetheless a prohibitory injunction.  <u>Id.</u>  The State of New York seeks precisely this type of relief on behalf of its citizens in its motion for a preliminary injunction.[9]

---

[9] The higher standard is also applicable in certain circumstances where a preliminary injunction provides "all the relief that is sought."  <u>Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 35 (2d Cir. 1995); <u>Abdul Wali</u>, 754 F.2d

Having identified the proper standard, the plaintiffs suggest that they are entitled to a presumption of irreparable harm because the Attorney General is a governmental entity seeking to enforce compliance with a statute that provides for injunctive relief. See, e.g., Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir. 1977); SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975). But that presumption may be improper where the application of the statute is claimed to be unconstitutional, and particularly so where the requested injunction might curtail activity protected by the First Amendment and thereby inflict irreparable injury on the defendant. See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Joelner v. Village of Washington Park, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'") (quoting Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998)).

_____

at 1026. Such circumstances are absent here. Issuance of the preliminary injunction requested in this case will not "make it difficult or impossible to render a meaningful remedy" to the defendants should they prevail on the merits at trial. Tom Doherty Assocs., 60 F.3d 27, 35 (2d Cir. 1995). On the contrary, the order can be "undone" and defendants would be free to resume their protest activities. Id.

Regardless of whether such a presumption applies, the plaintiffs have established a likelihood of irreparable harm if the requested injunction does not issue. The defendants are accused of obstructing access to medical facilities, and "women denied access cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability." New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989). Moreover, the plaintiffs have offered evidence that the defendants' activity threatens the efficacy of medical treatment to patients inside the Center (that is to say, those patients who make it past the attempted obstruction), a harm recognized by the Supreme Court in Madsen. Madsen, 512 U.S. at 768. "The irreparable harm flowing from defendants' activities -- including the medical risks and the denial of constitutionally guaranteed rights -- is real and threatens to continue." Terry, 886 F.2d at 1362. Injunctive relief is therefore proper if the plaintiffs can establish a likelihood of success on the merits.

## C. FACE

FACE specifically prohibits (1) acts of force, threats or force, or physical obstruction, (2) intentionally undertaken to injure, intimidate, or interfere with a person, (3) because that person is or has been obtaining or providing reproductive health services, or in order to intimidate a person or class of persons from obtaining or providing such services. 18 U.S.C. § 248(a)(1).[10] Intimidate is defined in the statute as "to place a

_____

[10] Under subsection (c)(3), a State Attorney General may bring suit based on past, present, or threat of future violations

30

person in reasonable apprehension of bodily harm to him- or herself or another." Id. at 248(e)(3).  Interfere with means "to restrict a person's freedom of movement." Id. at § 248(e)(2).

1. Force

Force is not a defined term in the statute, and "[w]hen words in a statute are not otherwise defined, it is fundamental that they will be interpreted as taking their ordinary, contemporary, common meaning." Morse v. Republican Party of Va., 517 U.S. 186, 254 (1996) (citation omitted); see also United States v. Dinwiddie, 76 F.3d 913, 924 (8th Cir. 1996) (rejecting a vagueness challenge to FACE because force is a "readily understandable term[] that [is] used in everyday speech"). Accordingly, force is broadly defined as "power, violence, or pressure directed against a person or thing." Dickson v. Ashcroft, 346 F.3d 44, 50 (2d Cir. 2003) (construing "use of force" in 18 U.S.C. § 16(a)).  It is not limited to "violent or assaultive" force, id.; see also H.R. Rep 103-306, at 11, as reprinted in 1994 U.S.C.C.A.N. 699, 708 (stating that "some acts of vandalism could constitute prohibited force"), and there is no exception for fleeting and de minimis contact, as defendants claim (assuming, of course, that the fleeting use of force was intentional).

Of all of the events described above, the incident on April 9, 2005 involving Menchaca is the clearest example of a use of

---

of the statute.  See 18 U.S.C. § 248(c)(3)(A); see also Operation Rescue Nat'l, 273 F.3d at 193-94 (acknowledging that suit may be based solely on threat of future violation).

force in violation of FACE. Menchaca came up to an escort volunteering at the Center, pressed his body into the escort, and pushed the escort when the escort told him to move away. All three elements of FACE are easily satisfied here. Both the body-pressing and the push involve the use of "power . . . or pressure directed against a person" and therefore qualify as force under the statute. The full-body press plainly restricted the escort's freedom of movement, and the push placed the escort in reasonable apprehension of bodily harm; there is no reason to believe that these uses of force were inadvertent. And finally, Menchaca's expression of outrage that the escort "do[es] what [he] do[es]" that accompanied the use of force confirms that Menchaca undertook these actions because the escort was a volunteer at the Center.

A second use of force occurred on November 6, 2004, when Cain pushed into an escort as she was opening the door for a patient. While other occasions on which Cain and Menchaca stumbled into escorts near the door may have been inadvertent and attributable to the defendants' practice of crowding patients and following on their heels, on this occasion Cain acted purposefully to make a point in the aftermath of a yelling match between a patient and the defendants.

In his summation, defense counsel argued that Menchaca was entitled to press his body against an escort's body because the escorts are engaged in a counter-demonstration and interpose their own bodies between the defendants and the patients. Frustration at the presence of escorts and their efforts to shield patients from unwanted interaction with the defendants

does not justify the use of force against an escort and does not provide a cognizable defense for Menchaca's actions in April of last year.

The plaintiffs have also offered circumstantial evidence that Menchaca incited others to throw gravel and stones at the Center and at escorts. This is a serious charge. Because the plaintiffs have shown through other evidence that they are entitled to an injunction, it is unnecessary to decide whether this incident would also support the injunction.

The other uses of force alleged by the plaintiffs lack clear evidence of the intent required by FACE. There are, as the Second Circuit noted in Sharpe v. Conole, 386 F.3d 482 (2d Cir. 2004), two separate intent elements required by FACE. See id. at 484. First, the defendant must act with the "intent to injure, intimidate, or interfere," id., (or to attempt to do so, see 18 U.S.C. § 248(a)(1)) with another person. This intent is lacking in several incidents in which the defendants have bumped into escorts or patients while following them to the Center door. These contacts belie the defendants' claims that they maintain a distance of several feet from their targets, and they demonstrate how the defendants' practices of following at close proximity greatly increase the likelihood of unwanted physical contact. But while such contact may be inappropriate, it is not illegal under FACE if it is not motivated by an intent to restrict freedom of movement or place another in reasonable apprehension of bodily harm. The plaintiffs have not shown that each instance where a defendant bumps into a patient or escort is motivated by this intent.

The second intent element in FACE "requires that a defendant act _because_ the interfered-with [or intimidated or obstructed] person was seeking, obtaining, or providing, or had obtained or provided, or might obtain or provide, reproductive health services." Sharpe, 386 F.3d at 484; 248 U.S.C. § 248 (a)(1). Almost all of the defendants' activities at the Center are motivated by this intent; as they readily admit, their goal is to discourage women from getting abortions. The notable exception is when Menchaca perceives a threat to his signs.

The evidence firmly established that Menchaca struck one escort with a sign he was carrying, charged into another after she had picked up one of the protestors' signs, and grabbed onto a man carrying a child. All three of these are acts of force, and all three were arguably undertaken intentionally to intimidate another person. But the plaintiffs have not shown that on these occasions Menchaca was acting because the victim was obtaining or providing reproductive health services.[11] On the contrary, the evidence shows that he acted to protect his property, which he felt was threatened in each instance. There is no reason to believe that Menchaca's reaction would have been different had the threat come from a passerby (as indeed, the man with a child might have been) as opposed to an escort or patient. These uses of force might well have been assaults, but they were not violations of FACE.

---

[11] In his summation, defense counsel took the remarkable position that Menchaca was justified in repeatedly striking an escort with a sign he was carrying because the escort was standing in front of another one of the defendants' signs that they had leaned against a lamppost.

34

2. Threats of Force

Although the Act refers only to "threat of force" without providing a definition, the Second Circuit has made clear that only those statements that are proscribable as threats under the First Amendment may give rise to liability under FACE. See Operation Rescue Nat'l, 273 F.3d at 196. "[A] district court must ask whether 'the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Id. In other words, as the Supreme Court recently explained, a true threat is the "communicat[ion of] a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia v. Black, 538 U.S. 343, 359 (2003).

The potency of a threat inheres as much in its present effect on a listener as in its predictive accuracy. See R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992) (citing impact on listener among reasons why "threats of violence are outside the First Amendment"). Indeed, "[t]he speaker need not actually intend to carry out the threat." Black, 538 U.S. at 359-60. The inquiry a court makes in assessing whether a statement is a true threat is therefore objective, focusing on whether an "ordinary, reasonable recipient who is familiar with the context of the [statement] would interpret it as a threat of injury." United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994). Proof of the actual effect of the threat on the recipient is relevant to this determination, Operation Rescue Nat'l, 273 F.3d at 196; Malik, 16

35

F.3d at 49, particularly if the recipient fails to react.  See
Operation Rescue Nat'l, 273 F.3d at 196 n.5; see also id. at 196
(warning that "excessive reliance on the reaction of recipients
would endanger First Amendment values").  Finally, a court must
be sure that the fear induced by the threat relates to "the
execution of the threat by the speaker (or the speaker's co-
conspirators)."  Id.  "[G]enerally, a person who informs someone
that he or she is in danger from a third party has not made a
threat, even if the statement produces fear."  Id.

Several of the defendants' statements qualify as threats
under this standard.  For example, Cain's statements to an escort
that he would "knock [her] in the head" (Fall 2004) and that she
"better not go home alone" because he had "[his] eyes on [her]"
(early October 2005), and his statement to another escort that he
was going to "bash [her] fucking head in" (March 19, 2005), are
all sufficiently "unequivocal, unconditional, immediate and
specific as to the person threatened, as to convey a gravity of
purpose and imminent prospect of execution."  Operation Rescue
Nat'l, 273 F.3d at 196 (citation omitted).

Similarly, Cain's repeated warnings to escorts that harm
would befall them if they got in his way again (January 22, 2004;
Fall 2004; December 18, 2004), are also true threats under the
Second Circuit's standard.  The threatened harm was, it is true,
conditioned on the escort getting in Cain's way (or at least Cain
thinking that they were in his way), but "a conditional threat .
. . is nonetheless a threat."  Malik, 16 F.3d at 49.[12]

_____

[12] The Second Circuit's analysis in Operation Rescue Nat'l
does not represent a shift in the law in this regard.  The Court

Beyond these explicit threats, Cain communicated threats to an escort on at least two other occasions. The first was his statement on March 12, 2005 to "stay out of [his] way. This is your last warning." The second was when he made a point of being seen inspecting the license plate on an escort's car. Both of these communications are implied threats. "An absence of explicitly threatening language does not preclude the finding of a threat." <u>Malik</u>, 16 F.3d at 49. Where there is "sufficient extrinsic evidence" such that "an ordinary and reasonable recipient familiar with the context of the [communication] would interpret it as a threat," then the question of whether it is a threat or not is one of fact, not of law. <u>Id.</u> at 50.

Here, there is ample evidence that would lead an ordinary recipient to interpret both incidents as true threats. Part of the context that a reasonable recipient would consider is the manner in which the threats are delivered. When Cain told an escort "this is your last warning," he was extremely close to her, screaming, and pointing a finger in his face. Any

_____

of Appeals specifically cited the threat considered in <u>Malik</u> as a true threat, notwithstanding its clearly conditional structure. <u>See</u> <u>Operation Rescue Nat'l</u>, 273 F,3d at 197 n.6 ("[D]efendant sent letter to court threatening [action] . . . if his case was not processed.").

Moreover, the whole point of the standard applied in <u>Operation Rescue Nat'l</u> is to identify as threats those statements that "convey a gravity of purpose and imminent prospect of execution." <u>Kelner</u>, 534 F.2d at 1027. Conditionality is relevant to the extent that it operates as a proxy for remoteness of possibility that the threatened action will be undertaken, not as a categorical divide. The statement "If you don't give me your wallet, I will shoot you in the head" would undoubtedly "convey a gravity of purpose and imminent prospect of execution" in the right circumstances (for example, when uttered by someone holding a gun). A rule that would make this statement not a true threat solely because it is conditional defies common sense.

reasonable person on a sidewalk in Manhattan would, as the escort did, interpret such a statement as a threat.

It does not matter that Cain did not tell the escort precisely how he would harm her. As the Second Circuit has warned,

> [R]igid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat.

Malik, 16 F.3d at 50. The warning in context "convey[ed] [the] gravity of purpose and imminent prospect of execution" of harm by the speaker that the First Amendment requires. Operation Rescue Nat'l, 273 F.3d at 196.

Much the same analysis applies to the conspicuous inspection of the license plate. That nonverbal conduct may communicate a true threat is beyond question. See, e.g., Black, 538 U.S. at 360 ("Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so."). "Written words or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published, United States v. Prochaska, 222 F.2d 1, 2 (7th Cir. 1955), quoted in Malik, 16 F.3d at 50, and the same must be true for non-verbal communication. In the context of an overtly hostile, and often physical, confrontation, when a person makes a show of noting the license plate of a car, a car owner would reasonably interpret the gesture as intended to communicate an intent to track the

owner down and harm her.[13]  There is no other logical explanation for the conduct.

Other statements made by the defendants, while genuinely perceived as threatening by the recipients, are not fairly characterized as true threats for First Amendment purposes, and are therefore protected speech that cannot form the basis of liability under FACE.  Cain has made a number of disturbing statements to escorts such as "I'd like to stick a coat hanger in you" and "Go to hell," and has employed a number of derogatory epithets in his taunts.  The references to personal characteristics of the escorts, vile and unsettling though they may be, simply do not "indicate the unequivocal immediacy and express intention of a true threat."  Operation Rescue Nat'l, 273 F.3d at 197.  The invocations of coat hangers, the spiritual well-being of the escorts and patients, and other abortion-specific references, go "to the core of [the defendants'] protest message," that abortion is a brutal and immoral practice.  Id. at 196.[14]  Moreover, "the statement[s] (even in context) did not suggest that [Cain] was engaged in a plan to harm the [recipient]."  Id. at 196-97.  These statements certainly

_____

[13] This particular threat might lack some of the immediacy of some of the other threats, as there was no evidence that he was in a position to track the license plate number there at the Center.  But this does not mean that the threat failed to convey "an imminent prospect of execution."  United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976).  In United States v. Sovie, 122 F.3d 122 (2d Cir. 1997), the Second Circuit found a true threat to possess sufficient immediacy even though it could not have been carried out until the next day.  Sovie, 122 F.3d at 125.

[14] These statements thus stand in sharp contrast to the threats discussed above, which bear no relationship whatsoever to the defendants' protest message.

contributed to the emotionally trying and unstable atmosphere at the Center, but they do not constitute true threats as defined by the Second Circuit.

Similarly, the references to a bomb, while certainly meant to intimidate and frighten the escorts, are not violations of FACE. They lack the immediacy and unequivocal nature of a true threat. In context, they are a disturbing reference to the willingness of some anti-abortion advocates to use murder and violence to discourage abortions. Nonetheless, these remarks did not convey that the defendants or their conspirators had formed any concrete intention to bomb the Center.

Cain's remarks as men threw gravel and stones at the Center and escorts do not qualify as violations of FACE either. The statements that escorts were lucky that they were not getting hit in the head and that they should watch out the next time, do not convey a threat that the defendants would cause harm to the escorts. The statements could be understood as a reminder of the dangers one faces working at an abortion clinic, or as defense counsel suggested in cross-examination and summation, the statements could even be understood as reflecting the speaker's expectation, or perhaps even hope, that escorts would be injured.

In order for those statements determined above to be true threats to also be considered violations of FACE, the defendant must have acted with the intent required by the statute. Both intent requirements are easily satisfied. The intent to intimidate is clear on the face of the threats. The circumstances of delivery, moreover, provide further evidence of the defendants' intent to intimidate. The defendants shouted

these statements in an angry tone while standing in very close proximity to the recipients on a sidewalk in Manhattan. Any reasonable person would recognize that accosting a target in such a manner would be sure to intimidate and would therefore be highly counterproductive in a counseling session. It is reasonable to infer, then, that such a technique would be avoided unless one's specific intent was to intimidate. Indeed, it is difficult to imagine what other purpose could conceivably be served by delivering such hostile statements in the manner adopted by the defendants.

There can likewise be little doubt that Cain threatened the escorts because of their participation in the provision of reproductive health services. In his testimony, Cain complained about efforts of the escorts, whom he referred to as "deathscorts," to block protestors and to prevent them from communicating with the patients. But this is precisely the role that escorts are supposed to play as they assist patients to obtain reproductive health services. See Escort Training Manual ("As escorts, you are there for one reason only: to ensure that patients and visitors gain access into the center with the least amount of trauma as possible."); see also Operation Rescue Nat'l, 273 F.3d at 195 (acknowledging that "protests make approaching health facilities unpleasant and even emotionally difficult"). Cain threatened the escorts with harm in an effort to dissuade them from fulfilling their obligations as escorts. This is precisely the type of conduct that FACE proscribes. All of the statements determined to be threats for First Amendment purposes are violations of FACE.

Defense counsel argued in summation and in motion papers that the defendants lacked the requisite intent to make "true threats."  Counsel reads the Supreme Court's opinion in <u>Virginia v. Black</u> to introduce an intent element into the First Amendment analysis of true threats.  Following <u>Black</u>, the argument goes, the First Amendment requires proof of the speaker's subjective intent to threaten harm before a statement may be constitutionally proscribable as a threat.[15]  Defense counsel also relies on a recent opinion from the Ninth Circuit adopting this interpretation.  <u>See</u> <u>United States v. Cassel</u>, 408 F.3d 622, 633 (9th Cir. 2005) ("[S]peech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."); <u>but see</u> <u>United States v. Romo</u>, 413 F.3d 1044, 1051 n.6 (9th Cir. 2005) (applying an objective test and distinguishing <u>Cassel</u> on the grounds that it did not, by its own terms, reach statutes that had been previously held to not require proof of subjective intent); <u>Cassel</u>, 408 F.3d at 633 n.8.

Defense counsel misreads <u>Black</u>.  The Court explained there

---

[15] Counsel's argument in summation was unclear as to exactly what kind of intent he imagined <u>Black</u> to require, an intent to threaten, or an intent to carry out the threatened action.  As the latter is squarely foreclosed by <u>Black</u> itself, <u>see</u> 538 U.S. at 359-60 ("The speaker need not actually intend to carry out the threat."), this Opinion will proceed on the assumption that counsel intends to argue for the former.

Counsel also appeared to suggest that this intent to threaten could not exist where the threat resulted from annoyance at the "counter-demonstration" of the escorts guiding patients into the Center, or was delivered as an excited utterance in the heat of a political contest.  His argument boils down to the truly remarkable proposition that ordinarily illegal conduct is no longer criminalizable when committed in the course of protected First Amendment activity.  This cannot be true.  Crime committed during a political demonstration is crime nonetheless.

that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. The relevant intent is the intent to communicate a threat, not as defense counsel maintains, the intent to threaten. Porter v. Ascension Parish School Bd., 393 F.3d 608 616-17 (5th Cir. 2004) ("[T]o lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly communicated to either the object of the threat or a third person.") (citing Black, 538 U.S. at 359).

One need only look at the reasons why threats are proscribable to see why defense counsel's position is misguided. "[A] prohibition on true threats 'protect[s] individuals from the fear of violence,' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" Black, 538 U.S. at 360 (quoting R.A.V. v. City of St. Paul, 505 U.S. at 388). A standard for threats that focused on the speaker's subjective intent to the exclusion of the effect of the statement on the listener would be dangerously underinclusive with respect to the first two rationales for the exemption of threats from protected speech. This is why the Second Circuit has long held that the test for whether a statement is a threat is objective, with a focus on how the statement would be interpreted by a reasonable recipient. See, e.g., United States v. Sovie, 122 F.3d 122, 125 (2d Cir.

1997).[16]

Yet regardless of whether <u>Black</u> effected a change in the law with respect to intent, defense counsel's argument is ultimately irrelevant. Testimony offered at the hearing suffices to establish that defendants' statements were threats under the proposed standard. The volume of the defendants' voices, their posture and proximity to the recipients, the frequency of occurrence, and most importantly, the content of the statements together amount to strong evidence that defendants made these statements with a subjective intent to threaten or intimidate, even if they did not subjectively intend to carry out the threatened action. Moreover, as discussed above, FACE explicitly requires that the threat be motivated by an intent to "intimidate[] or interfere[] with" a person seeking or providing reproductive health care services. 18 U.S.C. 248(a)(1). Given this requirement, it is unclear what defense counsel seeks to gain by reading a duplicative intent requirement into the First Amendment.[17] Under any standard, objective or subjective,

---

[16] Defendants attempt to shore up their argument on subjective intent by arguing that the Second Circuit had anticipated <u>Black's</u> subjective intent requirement in <u>Sovie</u> when it noted that "it is not enough to show the use of language that is literally threatening." <u>Sovie</u>, 122 F.3d at 125. Defendants apparently failed to read on: two sentences later, the court states unequivocally that "[t]he test is an objective one." <u>Id.</u>

[17] The Ninth Circuit recognized that incorporating a subjective intent element into First Amendment analysis under a similarly worded statute would have little real impact. <u>See</u> <u>United States v. Stewart</u>, 420 F.3d 1007, 1017 (9th Cir. 2005) ("[B]y its express language, [18 U.S.C. 115(a)(1)(B)] contains a specific intent element . . . . Thus, a conviction under that statute could only be had upon proof that the speaker intended the speech to impede, intimidate, interfere with, or retaliate against the protected official. Such proof would seem to subsume the subjective 'true threat' definition announced in <u>Black</u> and

whether imposed by FACE or the First Amendment, the defendants'
statements were true threats and were violations of FACE.

### 3. Physical Obstruction

"Physical obstruction" is defined in the Act as "rendering
impassable ingress to or egress from a facility that provides
reproductive health services . . . or rendering passage to or
from such a facility . . . unreasonably difficult or hazardous."
18 U.S.C. § 248(e)(4).  There must be an actual obstruction.  See
Operation Rescue Nat'l, 273 F.3d at 195 (criticizing
"constructive obstruction" as "an uncertain and potentially
slippery concept").  Thus, merely making the approach to health
facilities "unpleasant and even emotionally difficult does not
automatically" constitute a violation of the Act.  Id. at 195-96.
This does not mean, however, that physical obstruction is limited
to "bodily obstruction, but rather is broadly phrased to prohibit
any act rendering passage to the facility unreasonably
difficult."  United States v. Mahoney, 247 F.3d 279, 284 (D.C.
Cir. 2001).  Acts of physical obstruction that are sufficient to
create liability under FACE include obstructing or slowing access
to driveways or parking lots, Operation Rescue Nat'l, 273 F.3d at
196; standing in front of pedestrians as they try to enter a
clinic, id. at 194; blocking clinic doors by standing directly in
front of them, id.; blocking patients inside automobiles by
standing close to car doors, id. at 195; and participating in a

---

recognized in Cassel; one cannot have the intent required under
section 115(a)(1)(B) without also intending to make the
threat.").

demonstration so close to a clinic entrance that patients are compelled to use an alternate entrance, <u>Mahoney</u>, 247 F.3d at 284.[18]

The evidence presented at the hearing conclusively demonstrates that the defendants routinely obstruct access to and egress from the Center. Examples of this physical obstruction include standing near car doors so that patients cannot leave their cars (March 12, 2005), standing directly in front of a patient and preventing her from approaching the clinic while they attempt to give her literature (June 11, 2005), attempting to corner women against a wall while they "counsel" her against obtaining reproductive health services (August 2003; April 3, 2004), and standing directly in front of the Center door and refusing to move until a security guard approaches (April 7, 2005; numerous other occasions). All of these are examples of physical obstruction of the Center that "render impassable ingress to or egress from a facility" or make passage "unreasonably difficult or hazardous." 18 U.S.C. § 248 (e)(4). All of these, moreover, involve actual physical obstructions created by the defendants' bodies, as opposed to the type of "obstructive obstructions" that might be created by protected protest activities. <u>See Operation Rescue Nat'l</u>, 273 F.3d at 195.

On all of these occasions, defendants acted with the intent required by FACE. The intent to restrict patients' freedom of movement is plain from the nature of defendants' conduct. They

---

[18] As is evident from these examples, the obstruction need not be permanent or entirely successful. That patients may eventually have reached the Center in spite of defendants' actions is therefore beside the point.

block and corner patients in an effort to impede their progress to the clinic so that the defendants have more time in which to "counsel" them to leave the Center. The second intent element is uncontested: defendants freely admit to approaching women who are seeking reproductive health services. Consequently, each of the instances of physical obstruction described in this section is a violation of FACE and warrants injunctive relief.

The defendants' denials that they have engaged in this obstructive conduct, like their denials that they used force and made threats on at least some of the occasions described above, are not credible. Even though this is a preliminary injunction hearing, the plaintiffs have already presented significant, compelling evidence of violations of each of the three prongs of FACE and shown a strong likelihood of success at trial.

The defendants argue that they are entitled to hold their ground when they take a position on the sidewalk, and need not step aside to let patients enter the Center. The evidence shows, however, that the defendants do not stand in a stationary position and let women simply walk around them and enter the Center. Instead, the defendants approach the women and on occasion, as graphically described by the sole patient witness at the hearing for example, plant themselves directly in front of a patient, inches from her face, and then weave back and forth to block her path.

The defendants place great emphasis on the two videotapes that they played during the hearing as exemplars of their

customary behavior at the Center.[19]  They argue that the two
videotapes show that, although they approach patients and walk
closely on either side of them, they do not obstruct their
passage into the Center.  They argue further that the Court
should draw from the fact that the other seven videotapes were
not played by the plaintiffs, an inference that the evidence from
the other tapes would have shown that the defendants did not
obstruct access to the Center.[20]

The defendants are not entitled to have an adverse inference
drawn against the plaintiffs.  The issue raised by this motion
for a preliminary injunction is whether the plaintiffs have
carried their burden at this stage of the litigation based on the
evidence that they did present at the hearing.  They have done
so.

_____

[19] The Center's outside surveillance camera captures a
blurred and distant picture of the sidewalk in front of the
Center and extending to the Bleecker and Mott Street
intersection.  The Court initially allowed the defendants to
offer any of the videotapes taken on a day on which one of the
plaintiffs' witnesses described in their direct testimony a
specific event occurring, as well as one videotape as an exemplar
of how the defendants normally conduct themselves at the Center.
As it turned out, the defendants played excerpts from two
videotapes at the hearing, neither of which concerned a specific
event at issue at the hearing.

[20] The defendants have also moved for an adverse inference
to be drawn against the plaintiffs because the Center did not
preserve videotapes, choosing instead to regularly recycle them.
The defendants have not shown that the Center had any legal
obligation to preserve the tapes, or that even if it did, that an
adverse inference based on a spoliation theory can be drawn
against the State of New York's Attorney General, who was not the
creator or custodian of the videotapes.  See Byrnie v. Town of
Cromwell, 243 F.3d 93, 107 (2d Cir. 2001) ("Where one seeks an
adverse inference regarding the content of destroyed evidence,
one must first show that the party having control over the
evidence . . . had an obligation to preserve it at the time it
was destroyed.") (citation omitted) (omission in original).

Moreover, there are many reasons why a party would not choose to present its case through the videotapes. First, none of the videotapes are from the days on which witnesses testified that the defendants committed specific acts of force and, of course, the videotapes do not capture the defendants' verbal threats. Second, the quality of the videotapes makes them difficult to use at trial, as defense counsel's frustrations in trying to play them during the hearing illustrated. The Center's video camera appears to be positioned high on a wall at some distance from the door to the Center. It shoots footage at a fairly slow speed in order to conserve tape space, so when played, the action appears to transpire at many times normal speed (counsel estimated six times normal speed). When the footage is slowed down by the player so that it unfolds in real time, gaps in the recording become apparent and the movements of individuals depicted are jerky and blurred. Poor resolution, owing to the facts that the action is shot as considerable distance and that the tapes are worn down by frequent reuse, makes it difficult to identify the individuals that appear on the film.

In any event, the videotapes that the defendants played at the hearing did not help their case. To the contrary, they provided additional evidence that Cain did not give truthful testimony at the hearing. Among other things, the videotapes contradicted Cain's emphatic testimony about how far he and Menchaca stayed away from the Center's door. On the tapes, the men were shown following the patients right up to the door, and even past the open door to the threshold to the Center. The

tapes also show that patients frequently dart into the street and squeeze between parked cars to avoid the defendants when they stand near the corner of Bleecker and Mott Streets waiting for patients who have emerged from the subway.

In sum, the plaintiffs have carried their burden of showing an entitlement to a preliminary injunction based on both defendants' violations of FACE. The plaintiffs have shown a likelihood of proving at trial that the defendants have committed acts of force, uttered true threats, and physically obstructed access to the Center, all with the intent to intimidate or interfere with persons who were obtaining or providing reproductive health services, and that they are likely to continue to do so in the absence of an injunction.

D. New York Clinic Access Act

Plaintiffs also seek injunctive relief under the New York Clinic Access Act, N.Y. Civ. Rights Law § 79-m.[21] The terms of the Clinic Access Act are essentially identical to FACE, and all conduct constituting a violation of FACE will also constitute a violation of the Clinic Access Act. See New York ex rel. Spitzer v. Kraeger, 160 F. Supp. 2d 360, 372 (N.D.N.Y. 2001) ("Since the language of the Clinic Access Act is almost identical to FACE,

---

[21] The Clinic Access Act is codified in two separate parts. New York Penal Law § 240.70-240.71 defines and criminalizes the prohibited conduct, and Section 79-m of the Civil Rights Law authorizes the state Attorney General to seek injunctive relief when there is "reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of section 240.70 or 240.71 of the penal law." N.Y. Civ. Rights Law § 79-m.

the standards for proving a violation of the Clinic Access Act is the same as those for proving a violation of FACE."). <u>Compare</u> 18 U.S.C. § 248(a)(1) <u>with</u> N.Y. Penal Law § 240.70(1)(a). There is one provision of the New York Clinic Access Act that might permit injunctive relief in some situations where FACE would not apply, <u>see</u> N.Y. Penal Law § 270.40(1)(b), but as plaintiffs have not addressed its applicability and injunctive relief is granted under FACE, it is not necessary to decide whether this provision provides an alternate basis for relief.

E. Public Nuisance

Under New York law, a public nuisance "consists of conduct . . . which offend[s], interfere[s] with or cause[s] damage to the public in the exercise of rights common to all, in a manner such as to . . . interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." <u>Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.</u>, 362 N.E.2d 968, 971 (N.Y. 1977). "To be reckoned as 'considerable,' the number of persons affected need not be shown to be 'very great.' [It is] [e]nough that so many are touched by the offense and in ways so indiscriminate and general that the multiplied annoyance may not unreasonably be classified as a wrong to the community." <u>People v. Rubenfeld</u>, 254 N.Y. 245, 247 (1930); <u>see also</u> <u>Town of Mount Pleasant v. Van Tassell</u>, 166 N.Y.S.2d 458, 462 (N.Y. Sup. Ct. 1957) (describing a public nuisance as one that "causes substantial annoyance and discomfort indiscriminately to many and divers persons who are continually or may from time to time be in

the vicinity").

The right to obtain medical services, including reproductive health services, is a right common to all.  Terry, 886 F.2d at 1362.  A public nuisance may therefore be caused "by protest activities at health clinics that endanger the health and security of a considerable number of persons."  Operation Rescue Nat'l, 273 F.3d at 201.  The State may "bring an action to restrain a public nuisance that allegedly may be injurious to the health and safety of its citizens[;] it need not prove that it has suffered any actual, as opposed to threatened, harm in order to obtain injunctive relief."  Terry, 886 F.2d at 1361 (quoting New York v. Shore Realty Corp., 759 F.2d 1032, 1050-52 (2d Cir. 1985)).

A public nuisance may also be created by "[n]oise and other disturbances of the peace in a neighborhood."  Hoover v. Durkee, 622 N.Y.S.2d 348, 349 (App. Div. 1995).  "To be free of these conditions is a right which the neighborhood possesses at large," New York v. Waterloo Stock Car Raceway, 409 N.Y.S.2d 40, 44 (Sup. Ct. 1978), and may therefore be vindicated through a public nuisance action.  The relevant standard for a court to consider is "the effect of the offensive practice upon the reasonable man or woman of average sensibilities."  Rubenfeld, 254 N.Y. at 248. But whether the noise constitutes a public nuisance or merely an annoyance "depends on the facts and circumstances in each case." Hoover, 622 N.Y.S.2d at 349.

All of the activities that constitute physical obstruction for the purposes of FACE also create a public nuisance by impeding access to medical facilities.  When protestors outside

of a health facility prevent members of the public from obtaining the medical treatment by blocking access to a clinic, their conduct threatens harm to the health and safety of the citizens of New York and may be enjoined as a public nuisance. See Terry, 886 F.2d at 1361. The Center offers a variety of medical services, and the public's right to access all of these services is threatened by the defendants' conduct. See supra at 15-16 (discussing physical obstruction of a patient who was not seeking an abortion). Of perhaps greater concern, though, is that defendants' activities "pose a special threat to women seeking to obtain abortions because of delays and cancellations caused by [physical obstruction of the Center]." Terry, 886 F.2d at 1362. These threats warrant injunctive relief in order to eliminate the public nuisance created by defendants' conduct, and to safeguard the public's access to medical treatment at the Center.

The defendants also create a public nuisance with their yelling and shouting. Their excessive noise interferes with two distinct rights common to all: the right to obtain medical treatment, and the right to peaceful enjoyment of a neighborhood. The Supreme Court has recognized the special need for quiet in medical facilities, "where the patient and his family . . . need a restful uncluttered, relaxing, and helpful atmosphere." NLRB v. Baptist Hospital, Inc., 442 U.S. 773, 783-784, n.12, quoted in Madsen, 512 U.S. at 772. Patients at the Center, however, are not able to enjoy such an atmosphere. The defendants' recurring screams disrupt both pre- and post-operative counseling, frustrating the communication of important medical information between patients and Center staff.

Residents of the area around the Center are also deprived of
their right to peaceful enjoyment of their neighborhood.  The
defendants begin their protest activities as early as 7:00 a.m.
two mornings a week, one of which is Saturday, a day many people
devote to rest and relaxation.  The defendants do not respect the
requests of residents that they lower their voices, and even when
police are called, the defendants resume screaming shortly after
the police depart.  The noise created by the defendants is loud
enough to awaken the occupants of apartments on the fourth floor
of a nearby building and disrupts conversations on the second
floor of the Center.  The defendants' screaming causes
"substantial annoyance and discomfort indiscriminately to many
and divers persons" and is sufficient to disturb a reasonable
person of average sensibilities.  As such, it constitutes a
public nuisance and justifies the imposition of injunctive
relief.


                                III


     Having determined that injunctive relief is appropriate to
remedy a FACE violation, a court must take care to craft an
injunction that does not violate the First Amendment rights of
the defendant.  In this context, the First Amendment requires
that "the injunction burden no more speech than necessary to
serve a significant government interest."  <u>Schenck v. Pro-Choice
Network of Western New York</u>, 519 U.S. 357, 372 (1997) (citation

omitted); <u>Operation Rescue Nat'l</u>, 273 F.3d at 202.[22]

There is "little question that this type of injunction serves significant governmental interests." <u>Operation Rescue Nat'l</u>, 273 F.3d at 202. Both the Supreme Court and the Second Circuit have repeatedly recognized that "ensuring public safety and order[,] protecting freedom to receive reproductive health care services[,] advancing medical privacy and the well-being of patients seeking care at facilities, . . . [and] promoting free flow of traffic on streets and sidewalks," all of which are served by this injunction, are significant governmental interests. <u>Id.</u>; <u>see also</u> <u>Schenck</u>, 519 U.S. at 375-76; <u>Madsen</u>, 512 U.S. at 767-68. Indeed, the Supreme Court has specifically noted that the state's interest in protecting the health of its citizens "may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." <u>Hill v. Colorado</u>, 520 U.S. 703, 715 (2000). The combination of interests served by injunctive relief in this case are clearly sufficient to justify restrictions on the defendants' protest behavior. All that remains, then, is to ensure that the specific provisions of the requested injunctive relief burden no more speech than necessary to serve these interests.[23]

---

[22] Defendants' argument that an injunction would be an invalid content-based restriction of speech is without merit. "It is well settled that an injunction of this nature (<u>i.e.</u>, directed at protestors outside of abortion clinics but based on their unlawful behavior) is content-neutral." <u>Operation Rescue Nat'l</u>, 273 F.3d at 202; <u>see also</u> <u>Madsen</u>, 512 U.S. at 762-64.

[23] The text of plaintiffs' Proposed Preliminary Injunction is set forth in the Appendix.

A.  Paragraphs 1(A)-(E)

Paragraphs 1(A)-(E) of the proposed injunction essentially enjoin the defendants from engaging in conduct that is prohibited by FACE, or otherwise illegal.  These provisions do not raise First Amendment concerns for the same reasons that the statute itself passes constitutional muster.  See United States v. Weslin, 156 F.3d 292, 297 (2d Cir. 1998).

Paragraph 1(C) enjoins the defendants from "yelling or shouting on Mott Street...."  The Supreme Court instructs that courts "take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary."  Madsen, 512 U.S. at 772.  It further noted that "[n]oise control is particularly important around hospitals and medical facilities during surgery and recovery periods."  Because "a restful, uncluttered, relaxing, and helpful atmosphere" facilitates treatment and recovery, "[t]he First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." Id.  Madsen upheld an injunction against "singing, chanting, whistles, shouting, [or] yelling," within earshot of patients inside a clinic.  Id

These limited noise restrictions burden no more speech than necessary to ensure the health and well-being of the patients at the Center.  The defendants will still be permitted to engage in their "counseling" activities in a normal conversational tone, and they may distribute literature and display signs expressing their point of view to all passersby.  They are simply prohibited from shouting and yelling so that their voices will not disturb

56

patients at the Center and residents of the neighborhood.

The defendants have lodged several objections to the specific terms of paragraphs 1(A)-(E).  First, they request that the plaintiffs be required to prove a violation of the noise restriction through a surveillance audiotape.  Their request is denied.  If the plaintiffs contend that the defendants have shouted or yelled on Mott Street, they will have the burden of proving such a violation of the injunction and may do so through any admissible evidence.

Next, defendants request elaboration on the prohibition of threats consistent with the standard they adopt in their motion papers.  To the extent defendants' request is simply to lay out the First Amendment standard for a true threat, the request is denied as unnecessary.  Defendants' First Amendment rights will be sufficiently protected in future adjudications by the application of governing law; there is no need to spell all of that law out at this point.  To the extent, however, that this request is a renewed attempt to graft a subjective intent element onto the prohibition of threats, that request is denied for the reasons described above.

In their "Further Objections," defendants object to a prohibition of "tortiously harassing" and "crowding."  Defendants' requests to strike these terms are granted in part.  Although the term "tortiously harassing" seems to be a common fixture in this type of injunction, see, e.g., Schenck, 519 U.S. at 364 (temporary restraining order); Terry, 886 F.2d at 1345 (permanent injunction), it not immediately apparent what that would prevent.  "New York does not recognize a civil cause of

action for harassment." <u>Broadway Central Property Inc. v. 682</u> <u>Tenant Corp.</u>, 749 N.Y.S.2d 225, 227 (1st Dep't 2002); <u>General</u> <u>Motors Acceptance Corp. v. Desbiens</u>, 623 N.Y.S.2d 939, 942 (3d Dep't 1995); <u>Goldstein v. Tabb</u>, 575 N.Y.S.2d 902, 904 (2d Dep't 1991); <u>see also</u> <u>New York Stock Exchange, Inc. v. Gahary</u>, 196 F. Supp. 2d 401, 414 (S.D.N.Y. 2002) ("New York law does not recognize any independent tort for harassment."). Harassment is, however, a crime under various provisions of the New York Penal Law, <u>see</u> N.Y. Penal Law §§ 240.25 – 240.32, and indeed Menchaca has been charged under one of them for his conduct at the Center. To better reflect New York law and the specifics of this case, the word "tortiously" is stricken from the injunction, so that defendants will be prohibited only from harassment as that term is defined by New York criminal law. "Crowding" is also stricken from the proposed injunction. While the evidence established that defendants do in fact crowd patients and escorts, this provision of the injunction would be difficult to enforce as a practical matter without establishing a fixed distance that defendants are required to maintain. As discussed below, no such requirement is adopted at this time.

Although the defendants have not objected to it, there is an additional provision in paragraph 1 which should be stricken. There is no evidence that the defendants have trespassed on, defaced, vandalized or damaged any Center property. Accordingly, paragraph 1(D) of the proposed injunction shall be stricken.

B. Fixed Buffer Zone

Paragraph 2 of the proposed injunction creates a buffer zone

around the entrance to the Center that the defendants are not permitted to enter. The map attached to the proposed injunction indicates that the buffer zone includes the sidewalk on the east side of Mott Street running from the south side of Bleecker Street to a point eighteen feet south of the Center entrance, as well as the crosswalk connecting the southeast and southeast corners of the intersection. Within this buffer zone is a space carved out for the defendants' protest activities (the "Demonstration Corridor"). This space measures three feet wide and twenty-two feet, eleven inches long and is situated between a planter and the south edge of the crosswalk. The Demonstration Corridor is directly opposite the entrance to the Center.

This buffer zone does not restrict more speech than necessary. As the Second Circuit has explained, "buffer zones immediately around entrances . . . are narrowly tailored to ensure clinic access and to burden no more speech than is necessary." Operation Rescue Nat'l, 273 F.3d at 204. This particular buffer, moreover, is not so large as to "significantly curtail the exercise of First Amendment rights in the public areas around" the Center. Id. at 205. Indeed, the Demonstration Corridor provides over sixty square feet of sidewalk, directly opposite the Center entrance, in which defendants are free to carry out their protest activities. This dedicated space, running more than twenty-two feet long, preserves opportunity for "picketing and communication from a normal conversational distance along the public sidewalk." Id. at 206. There is no "effective prohibition of close range communication in public areas near" the Center. Id. at 206.

Considering the "overall effect on free speech activities," id., the injunction is minimally intrusive on defendants' rights. Like the statute upheld by the Supreme Court in Hill, the injunction "leaves open ample alternative channels for communication." Hill, 530 U.S. at 726. From a distance of ten feet, defendants "could communicate at a normal conversational distance" with passersby or anyone entering or exiting the Center. Operation Rescue Nat'l, 273 F.3d at 206. And the injunction does not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can readily accept," Hill, 530 U.S. at 727. Nor are defendants prevented from displaying signs in the Demonstration Corridor that will be clearly visible to anyone approaching the Center entrance. See id. at 726. Finally, defendants are left with ample public space around the Center to carry out their activities without restriction, including the entire sidewalk on the west side of Mott Street.

Paragraph 2(A) will be modified to permit the defendants to enter the buffer zone for the sole purpose of making their way to or exiting from the Demonstration Corridor. Otherwise, the defendants would be forced to jay-walk across Mott Street to enter the Demonstration Corridor. When cars are parked along Mott Street, such a passage may be particularly difficult. The modification will forbid the defendants from engaging in any counseling efforts, or otherwise having any conversation or contact with another person while in the buffer zone, and their

passages through the buffer zone must be infrequent.[24]  If this
modification, intended to ease the defendants' access to the
Demonstration Corridor, becomes a vehicle for confrontation or an
invitation to violate the other terms of the injunction, the
plaintiffs may apply for a modification.

The defendants' request for a five-foot-wide Demonstration
Corridor is denied.  The sidewalk on the east side of Mott Street
is only thirteen feet wide.  Since no one customarily walks
within one or two feet of a building wall, a Demonstration
Corridor five feet wide would effectively leave a sidewalk only
six feet wide.  This is too narrow.  On the other hand, a
Demonstration Corridor three wide gives ample room for a person
to stand (or sit), display signs, distribute literature, and
address passersby.  Moreover, as the videotapes that the
defendants played at the hearing showed, and as Cain agreed, the
Demonstration Corridor is one of the two locations in which the
defendants have customarily chosen to stand and wait for patients
entering the Center, the other being the corner.  The
Demonstration Corridor thus preserves for the defendants their
right to use one of their preferred spaces, a space that they
have consistently used during their years of advocacy at the

---

[24] Defendants object to the buffer zone on the ground that
it will be difficult to move between the Demonstration Corridor
and the corner of Bleecker and Mott Streets, where they prefer to
display their Baby Malachi sign for maximum viewability.  "The
First Amendment, however, does not guarantee [defendants] access
to every or even the best channels or locations for their
expression."  Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914,
919 (2d Cir. 1990).  If the defendants wish to be able to reach
their sign quickly and frequently from the Demonstration
Corridor, then they may have to display it elsewhere.

Center.  It also gives them almost twenty-three feet to walk along and speak with patients entering the Center if they desire to do so.  Because the Corridor extends on either side of the Center's entrance, they are able to speak with patients coming from either direction.

With the modification described above, permitting the defendants to pass through, but not advocate within, the buffer zone, the injunction will include the buffer zone requested by the plaintiffs.  The parties may apply for modifications as experience dictates that modifications are warranted.

C. Floating Buffer Zone

Decision on the need for the floating buffer zone requested by plaintiffs is reserved.  The plaintiffs may renew their request for a floating buffer zone if the injunction entered today proves insufficient to address the violations of FACE already shown at the hearing.  See United States v. Scott, 187 F.3d at 288-89 (upholding a floating buffer zone where a protestor had violated the less restrictive injunction previously issued by a district court).

IV.

The plaintiffs have carried their burden of establishing a likelihood of success on the merits of their claims that defendants have violated FACE and created a public nuisance through their activities outside the Center.  Because these activities threaten irreparable harm to the citizens of New York

who are denied access to reproductive health care services, injunctive relief is appropriate. Plaintiffs' motion for a preliminary injunction is therefore granted in part.

SO ORDERED:

Dated:     New York, New York
           February 15, 2006

                                    _____
                                           DENISE COTE
                                    United States District Judge

<u>APPENDIX</u>

<u>PROPOSED PRELIMINARY INJUNCTION</u>

Upon consideration of the complaint, plaintiffs' motion for a preliminary injunction and the declarations submitted in support of that motion, the Court finds that plaintiffs have shown by a preponderance of the evidence that they will suffer irreparable harm if injunctive relief is not granted and a likelihood of success on the merits, and that they are entitled to injunctive relief under the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, Section 79-m of the New York Civil Rights Law, and the New York State law of public nuisance; and it is therefore hereby

ORDERED that defendants, their agents and representatives, and all other persons whomsoever, known or unknown, acting on their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:

1.    Enjoined and restrained from:

(A) blocking, impeding or obstructing any person who is or has been obtaining or providing reproductive health services ingress to or egress from the  Planned Parenthood of New York City Margaret Sanger Center, located at 26 Bleecker Street, New York (Sanger Center or Center) in the Southern District of New York;

(B) physically abusing, grabbing, touching, pushing, shoving, crowding or tortiously harassing persons approaching, entering or leaving, working at or using the services of the Center;

(C) yelling or shouting on Mott Street between Bleecker Street and Houston Street or on Bleecker Street between Mulberry Street to the Bowery;

(D) trespassing on, defacing, vandalizing, or damaging in any way the property belonging to the Center; and

(E) threatening bodily harm to any person approaching, entering or leaving, working at or using the services of the Center;

2. Are further enjoined and restrained from:

(A) being present in or on any portion of the sidewalk or curb on the east side of Mott Street within a buffer zone that extends 30 feet 2 inches to the north and 18 feet to the south of the entrance to the Center, and otherwise as such buffer zone is demarcated on the diagram attached hereto and made a part hereof as Exhibit 1;

(B) within 200 feet from the Center's entrance, knowingly coming within 5 feet of any person, or within 5 feet of an automobile occupied by any such person, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person, once that person indicates verbally that he or she does not want to accept literature or listen to any communication or counseling, and as demarcated on the diagram attached hereto and made a part hereof as Exhibit 2; and

3. Are further enjoined and restrained from inducing,

directing, aiding or abetting in any manner, others to take any of the actions described in paragraphs 1 through 2, above.

IT IS FURTHER ORDERED that this Order may be enforced by a motion for criminal and/or civil contempt; and

IT IS FURTHER ORDERED that each person found in violation of this Order, in addition to any criminal contempt penalties assessed, shall be jointly and severally liable for actual damages incurred by plaintiffs or any facility at which a violation occurs or by any person who is injured by such a violation, and shall be jointly and severally liable for all attorneys' fees and related costs incurred by plaintiffs in relation to the enforcement of this Order; and

IT IS FURTHER ORDERED that, except as set forth herein, nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate rights under the First Amendment of the United States Constitution; and

IT IS FURTHER ORDERED that nothing in this Order shall be construed to supersede or diminish the obligation of federal, state, and local law enforcement authorities to fulfill their duties and responsibilities in enforcing federal and state laws and local ordinances; and

IT IS FURTHER ORDERED that nothing in this Order shall be construed to limit or interfere with the ability of federal, state, and local law enforcement authorities to take, if necessary, additional measures under the law, above and beyond the restrictions contained in this Order, to maintain order and

keep the peace; and

IT IS FURTHER ORDERED that this Order shall remain in full force and effect until modified by further Order, or until final resolution by this Court of the claims for permanent injunctive relief in the above-captioned matter.